IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Richard P. Turasky, Jr. Individually, Richard P. Turasky, Jr., as Trustee of the Richard P. Turasky, Jr. Revocable Trust dated April 17, 2009, and RT Ventures Limited Partnership, a Delaware Limited Partnership,<br><br>    Plaintiffs,<br><br>v.<br><br>Prospect Financial, Inc., a Canadian Corporation, Gordon Reykdal, Individually, and Carrie Reykdal, Individually,<br><br>    Defendants. | Case No. |

## COMPLAINT

NOW COME the Plaintiffs, Richard P. Turasky, Jr., individually ("Turasky"), Richard P. Turasky, Jr., as Trustee of the Richard P. Turasky, Jr. Revocable Trust dated April 17, 2009 (the "Turasky Trust"), and RT Ventures Limited Partnership, a Delaware Limited Partnership ("RT Ventures"), by and through their attorneys, Kelleher & Buckley, LLC, and for their Complaint against Prospect Financial, Inc., a Canadian Corporation ("Prospect Canada"), Gordon Reykdal, Individually ("Gordon"), and Carrie Reykdal, Individually ("Carrie") (Gordon and Carrie are hereinafter collectively referred to as the "Reykdals"), state as follows:

## THE PARTIES

1.     Turasky is a natural person who resides in Lake in the Hills, Illinois.

2.     The Turasky Trust is a revocable living trust that is construed under and governed by Illinois law.

1

3.      RT Ventures is a Delaware Limited Partnership. Its principal place of business is located in Elgin, Illinois.

4.      Prospect Canada is a Canadian Corporation. Its principal place of business is located in Edmonton, Alberta.

5.      Gordon is a natural person who resides in Edmonton, Alberta, Canada.

6.      Carrie is a natural person who resides in Edmonton, Alberta, Canada.

## JURISDICTION

7.      This court has diversity jurisdiction with respect to Plaintiffs' claims against Prospect Canada, Gordon, and Carrie pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Prospect Canada pursuant to 735 ILCS 5/2-209(7) because its Chief Executive Officer, Gordon, executed that certain Consulting Services Engagement Letter with RT Ventures on September 26, 2016 (the "Consulting Agreement").

9.      This court has personal jurisdiction over Gordon pursuant to 735 ILCS 5/2-209(a)(12) because Gordon is an officer of Prospect Financial USA, Inc. ("Prospect USA"), which is a wholly owned subsidiary of Prospect Canada. Prospect USA is a Delaware Corporation. Prospect USA's principal place of business is located in Elgin, Illinois.

10.     This court has personal jurisdiction over Carrie based on: (a) the purposeful availment of EAM Enterprises, Inc., a Canadian Corporation in which Carrie is a Director and one hundred percent (100%) shareholder ("EAM"), to Illinois law by contributing more than one million dollars ($1,000,000.00) of funds that were used to purchase certain pieces of real estate located in Illinois that are currently owned by Prospect USA; and (2) Carrie's principal-agent

2

relationship with Gordon with respect to the negotiation and execution of the October 25, 2016 Articles of Agreement for Deed concerning the real estate commonly known as 9290 East Thompson Parkway, Unit 418, Scottsdale, Arizona 85225 (the "Contract for Deed") and her subsequent breach of said agreement.

## VENUE

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

12.     In or around December 2015, Turasky met the Reykdals in Scottsdale, Arizona.

13.     At all relevant times, Gordon has been the Chairman of the Board and Chief Executive Officer of Prospect Canada.

14.     At all relevant times, Carrie and/or EAM has been Prospect Canada's largest shareholder.

15.     When Turasky met the Reykdals in or around December 2015, Turasky and the Reykdals discussed their respective business interests and contemplated entering into a transaction in which Turasky and the Reykdals would contribute some of their respective business interests into a shared business entity and they would become business partners.

16.     The initial discussions between Turasky and the Reykdals in December 2015 primarily occurred at the address commonly known as 9290 East Thompson Parkway, Unit 418, Scottsdale, Arizona 85225 (the "Arizona Property").

17.     Subsequent discussions between Turasky and the Reykdals during and after December 2015 about the possibility of entering into a business relationship occurred via telephone and email when Turasky was located in Illinois and the Reykdals knew Turasky was in Illinois.

18.     In furtherance of Turasky's discussions with the Reykdals, Turasky provided certain financial information, such as bank appraisals and accounting records, to the Reykdals concerning the assets owned by Capital Realty Fund I, LLC, which is a manager-managed Illinois Limited Liability Company ("CR Fund I").

19.     When Turasky and the Reykdals discussed entering into a business relationship together, Turasky was a member of CR Fund I and held the largest membership interest in CR Fund I.

20.     At the time in which Turasky and the Reykdals discussed entering into a business relationship together, Capital Realty Investors I, LLC was CR Fund I, LLC's manager.

21.     At the time in which Turasky and the Reykdals discussed entering into a business relationship together, Turasky was Capital Realty Investors I, LLC's manager.

22.     At the time in which Turasky and the Reykdals discussed entering into a business relationship together, Turasky represented to the Reykdals that CR Fund I owned one hundred percent (100%) of the interest in five (5) separate Illinois Limited Liability Companies which each owned commercial real estate located in the State of Illinois.

23.     The five (5) limited liability companies that CR Fund I owned in December 2015 were: CR-2555 Decade LLC, which owned the real property commonly known as 2555 Decade Court, Elgin, Illinois; CR-1100 Commerce LLC, which owned the real property commonly known as 1100 Commerce Drive, West Chicago, Illinois; CR-1301 Basswood LLC, which owned the real property commonly known as 1301 Basswood Road, Schaumburg, Illinois; CR-1201 Wiley LLC, which owned the real property commonly known as 1201 Wiley Road, Schaumburg, Illinois; and CR-1329 Commerce LLC, which owned the real property commonly known as 1329 Commerce

Drive, Crete, Illinois (these five (5) commercial properties are hereinafter referred to as the "CR Fund I Properties").

24.     During and after December 2015, Turasky represented to the Reykdals that, if the CR Fund I Properties were fully stabilized, CR Fund I would have approximately eight million dollars ($8,000,000) of combined equity in the CR Fund I Properties.

25.     During and after December 2015, Turasky provided lender and third-party appraisals to the Reykdals to support his representations that CR Fund I would have approximately eight million dollars ($8,000,000) of combined equity in the CR Fund I Properties if the CR Fund I Properties were fully stabilized.

26.     The representations Turasky made to the Reykdals during and after December 2015 about the CR Fund I Properties were accurate and truthful.

27.     When Turasky and the Reykdals discussed entering into a business relationship together, Turasky made representations about additional commercial real estate located in Illinois that Turasky believed could be acquired by the business he and the Reykdals contemplated starting.

28.     The representations Turasky made to the Reykdals in December 2015 at the Arizona Property concerning the possibility of obtaining additional commercial real estate other than the CR Fund I Properties that could be acquired by their proposed business entity were accurate and truthful.

29.     The representations Turasky made to the Reykdals after December 2015 concerning the possibility of obtaining additional commercial real estate other than the CR Fund I Properties that their proposed business entity could acquire were accurate and truthful.

30.     In December 2015, when Turasky and the Reykdals initially discussed entering into a business relationship together, the Reykdals made representations and submitted financial

projections to Turasky concerning the profitability and success of certain companies and assets in which they currently had an ownership interest and companies in which they would have an ownership interest at some date in the near future.

31.     After the December 2015 discussions between Turasky and the Reykdals about entering into a business relationship together, the Reykdals continued to make representations to Turasky about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future.

32.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the representations the Reykdals made to Turasky about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future were inaccurate and false.

33.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals knew and/or reasonably believed that the representations they made to Turasky about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future were inaccurate and false.

34.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals intended for Turasky to rely on their false representations about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future by entering into a business relationship with them.

35. During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky did not know that the representations the Reykdals made about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future were inaccurate and false.

36. During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky justifiably relied on the Reykdals' misrepresentations about the profitability and success of certain companies and assets in which they had a current ownership interest and companies in which they would have an ownership interest at some date in the near future by entering into a business relationship with the Reykdals.

37. In December 2015, when Turasky and the Reykdals initially discussed entering into a business relationship together, the Reykdals made representations to Turasky that they could provide the funds necessary to finance the future growth of the proposed business relationship.

38. After the December 2015 discussions between Turasky and the Reykdals about entering into a business relationship together, the Reykdals continued to make representations to Turasky that they could provide the funds necessary to finance the future growth of the proposed business relationship.

39. During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the representations the Reykdals made to Turasky that they could provide the funds necessary to finance the future growth of the proposed joint business were inaccurate and false.

40. During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals knew and/or reasonably believed that

7

the representations they made to Turasky that they could provide the funds necessary to finance the future growth of the proposed joint business were inaccurate and false.

41.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals intended for Turasky to rely on their false representations that they could provide the funds necessary to finance the future growth of the proposed joint business by entering into a business relationship with them.

42.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky did not know that the representations the Reykdals made that they could provide the funds necessary to finance the future growth of the proposed joint business were inaccurate and false.

43.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky justifiably relied on the Reykdals' misrepresentations that they could provide the funds necessary to finance the future growth of the proposed joint business by entering into a business relationship with the Reykdals.

44.     In December 2015, when Turasky and the Reykdals initially discussed entering into a business relationship together, the Reykdals assured Turasky that they had the ability to obtain financing, if necessary, for the proposed joint business.

45.     After the December 2015 discussions between Turasky and the Reykdals about entering into a business relationship together, the Reykdals continued to assure Turasky that they had the ability to obtain financing, if necessary, for the proposed joint business.

46.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the assurances the Reykdals provided to Turasky

8

that they had the ability to obtain financing, if necessary, for the proposed joint business were inaccurate and false.

47.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals knew and/or reasonably believed that the assurances they provided to Turasky that they had the ability to obtain financing, if necessary, for the proposed joint business were inaccurate and false.

48.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, the Reykdals intended for Turasky to rely on their false assurances that they had the ability to obtain financing, if necessary, for the proposed joint business by entering into a business relationship with them.

49.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky did not know that the assurances the Reykdals made to him that they had the ability to obtain financing, if necessary, for the proposed joint business were inaccurate and false.

50.     During and after December 2015, when Turasky and the Reykdals discussed entering into a business relationship together, Turasky justifiably relied on the Reykdals' false assurances that they had the ability to obtain financing, if necessary, for the proposed joint business by entering into a business relationship with the Reykdals.

51.     At the time in which Turasky and the Reykdals initially discussed entering into a business relationship together, the Reykdals made representations to Turasky about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they and/or their businesses were pursuing.

52.     After Turasky and the Reykdals' initial December 2015 discussion about entering into a business relationship together, the Reykdals continued to make representations to Turasky about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they and/or their businesses were pursuing.

53.     The representations the Reykdals made to Turasky during and after December 2015 about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they were pursuing were inaccurate and false.

54.     The Reykdals knew and/or reasonably believed that the representations they made to Turasky about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they were pursuing were inaccurate and false.

55.     The Reykdals made inaccurate and false representations to Turasky about additional profitable and successful business interests in the United States, Canada, and Russia, with the intent that Turasky would rely on those false representations by entering into a business relationship with them.

56.     During and after Turasky's initial December 2015 discussions with the Reykdals about entering into a business relationship together, Turasky did not know that the representations the Reykdals made about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they were pursuing were false.

57.     During and after initial December 2015 discussions between Turasky and the Reykdals about entering into a business relationship together, Turasky justifiably relied on the representations the Reykdals made about additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they were pursuing by entering into a business relationship with the Reykdals.

58.     During and after Turasky's initial December 2015 discussions with the Reykdals about entering into a business relationship together, the Reykdals concealed the following information from Turasky: (a) Gordon's prior bankruptcies, (b) Gordon's resignation as a director of The Cash Store Financial Services, Inc., a Canadian Corporation, after Gordon and/or The Cash Store Financial Services, Inc. was named as a defendant in several class action lawsuits that were filed in the United States and Canada for violation of federal securities laws, and (c) that Gordon was the subject of an inquiry from the Alberta Canada Securities Commission concerning his role in authorizing the Cash Store Financial Services, Inc. to file financial statements that were not prepared in accordance with generally accepted accounting principles.

59.     Based on the representations the Reykdals made to Turasky in December 2015 at the Arizona Property and thereafter about (a) certain companies and/or assets they owned, (b) their ability to provide the funds necessary to finance the future growth of the proposed joint business, (c) their ability to obtain financing, if necessary, for the proposed joint business, and (d) the additional profitable and successful business interests in the United States, Canada, Scotland, Iceland, and Russia that they were pursuing, Turasky advised the Reykdals that he would seek approval from the members of CR Fund I to enter into a business relationship with the Reykdals.

60.     Based on the representations the Reykdals made to Turasky in December 2015 at the Arizona Property and thereafter, Turasky sought, and obtained, approval from the members of CR Fund I to combine the CR Fund I Properties with certain assets and/or companies in which the Reykdals had an ownership interest.

61.     In March 2016, the Reykdals met Turasky in Rosemont, Illinois, to discuss moving forward with the proposed joint business.

62.     In the weeks leading up to April 2016, Turasky and Gordon negotiated the terms under which CR Fund I would combine its assets with Prospect Canada's assets via telephone and email while Turasky was located in Illinois.

63.     Effective April 15, 2016, the board members of Prospect Canada executed a Board Resolution that laid out the terms of an agreement between Prospect Canada, CR Fund I, and RT Ventures. A copy of Prospect Canada's April 15, 2016 Board Resolution is attached as Exhibit "A" and is incorporated by reference.

64.     Turasky was present when Prospect Canada's Board of Directors executed the Board Resolution dated April 15, 2016, he witnessed each member of Prospect Canada's Board of Directors execute the Board Resolution, and he approved the Board Resolution on behalf of CR Fund I and RT Ventures.

65.     As set forth in Paragraph 6.c.iii of the April 15, 2016 Prospect Canada Board Resolution, Prospect Canada was obligated to guarantee repayment of a shareholder loan to Turasky in the amount of two million dollars ($2,000,000) plus ten percent (10%) annual interest. *See* Exhibit A, ¶ 6.c.iii.

66.     Prospect Canada agreed to guarantee repayment of Turasky's shareholder loan in the amount of two million dollars ($2,000,000) plus ten percent (10%) annual interest under so that Turasky would agree to move forward with the proposed business relationship with the Reykdals.

67.     Turasky has never received any repayment of principal or payment of any interest due under the two million dollar ($2,000,000) shareholder loan set forth in Paragraph 6.c.iii of Prospect Canada's April 15, 2016 Board Resolution.

68.     On or around April 11, 2016, in furtherance of Turasky's business negotiations with the Reykdals, Carrie, through EAM, provided one hundred sixty thousand dollars ($160,000) to The Capital Companies, LLC, an Illinois Limited Liability Company ("The Capital Companies") for the purchase of a twelve and one-half percent (12.5%) interest in certain commercial property at the address commonly known as 11800 Factory Shops Boulevard, Huntley, Illinois (the "Huntley Property").

69.     At all relevant times, The Capital Companies' manager was RT Ventures.

70.     The Capital Companies' sole member is RT Ventures.

71.     On or about May 4, 2016, in furtherance of Turasky's business negotiations with the Reykdals, Carrie, through EAM, provided seven hundred thirty-three thousand dollars ($733,000) to CR-2300 Bushwood LLC, an Illinois Limited Liability Company that was a wholly owned subsidiary of The Capital Companies, for the purchase of a one hundred percent (100%) interest in certain commercial property located at 2300 Bushwood Drive, Elgin, Illinois (the "Elgin Property").

72.     After Prospect Canada's Board of Directors passed the Board Resolution dated April 15, 2016, Turasky, Gordon, Carrie, and Prospect Canada began operating the CR Fund I Properties, as well as The Capital Companies' interests in the Huntley Property and the Elgin Property, as though Prospect Canada's wholly owned subsidiary, Prospect USA, owned those properties.

73.     In or around June 2016, Prospect USA became the sole owner of the CR Fund I Properties.

74.     In or around June 2016, as provided in Paragraph 6.b of the April 15, 2016 Prospect Canada Board Resolution, CR Fund I transferred its ownership interest in the CR Fund I Properties to Prospect USA, CR Fund I in exchange for three million (3,000,000) shares of Prospect Canada.

75.     In or around June 2016, as provided in Paragraph 6.a of the April 15, 2016 Prospect Canada Board Resolution, RT Ventures became owner of four million (4,000,000) shares of Prospect Canada.

76.     In or around June 2016, Prospect USA became the owner of a twelve and one-half percent (12.5%) interest in the Huntley Property.

77.     In or around June 2016, Prospect USA became the sole owner of CR-2300 Bushwood LLC and CR-2300 Bushwood LLC's only asset, the Elgin Property.

78.     In or around December 2016, Prospect USA's wholly owned subsidiary, Darien Business Center LLC, purchased the certain commercial property at the addresses commonly known as 7955 South Cass Avenue, 8141-8187 South Cass Avenue, 8201 South Cass Avenue, and 8205 South Cass Avenue in Darien, Illinois (collectively, the "Darien Business Center").

79.     Prior to Darien Business Center, LLC's purchase of the Darien Business Center, The Capital Companies had been under contract to purchase the Darien Business Center, but Turasky permitted Prospect USA's subsidiary to take title to the property.

80.     In or around June or July 2016, RT Ventures provided one hundred fifty thousand dollars ($150,000) in earnest money for Prospect USA's purchase of the Darien Business Center.

81.     Pursuant to Paragraph 11 of the April 15, 2016 Prospect Canada Board Resolution, Prospect Canada agreed to enter into a five (5) year management agreement with Turasky in which Prospect Canada would pay Turasky twenty-three thousand dollars ($23,000) per month to

14

Turasky beginning on October 1, 2016, which Prospect Canada intended would further induce Turasky to enter into the proposed business relationship with it. *See* Exhibit A, ¶ 11.

82.     In furtherance of Paragraph 11 of the April 15, 2016 Prospect Canada Board Resolution, on September 26, 2016, Gordon, as chairman and CEO of Prospect Canada, executed the Consulting Agreement. A copy of the Consultant Agreement is attached as Exhibit "B" and is incorporated by reference.

83.     In late August and/or early September 2016, after (a) RT Ventures had become a shareholder of Prospect Canada and RT Ventures and (b) Prospect Canada executed the Consulting Agreement, the Reykdals induced Turasky to purchase and acquire the Arizona Property from them by and through the Contract for Deed. A copy of the Contract for Deed is attached hereto as Exhibit "C" and is hereby incorporated by reference.

84.     In October 2016, Gordon and other members of Prospect Canada's Board of Directors traveled to Elgin, Illinois and conducted a Prospect Canada board meeting at The Capital Companies' office.

85.     Despite the Reykdals' misrepresentations about their business dealings, Turasky has used his best efforts to make the business relationship with the Reykdals as successful as possible.

## Count I
## RT Ventures v. Prospect Canada – Breach of Contract
## (Consulting Agreement)

86.     RT Ventures re-alleges paragraphs one (1) through eighty-five (85) as paragraph eighty-six (86) of Count I.

87.     Pursuant to Paragraph 4 of the Consulting Agreement, beginning on October 1, 2016, Prospect Canada has been obligated to pay RT Ventures twenty-three thousand dollars ($23,000.00), plus applicable taxes, per month. *See* Exhibit B, ¶ 4.

88.     Pursuant to Paragraph 2 of the Consulting Agreement, Prospect Canada cannot terminate its obligations under the Consulting Agreement until at least six (6) months after October 1, 2019. *Id.* at ¶ 2.

89.     Between October 1, 2016, and April 1, 2018, Prospect Canada has only paid sixty-five thousand four hundred forty-eight and 10/100 dollars ($65,448.10) of the money it has been obligated to pay RT Ventures through April 1, 2018.

90.     As of April 17, 2018, the total outstanding amount of money Prospect Canada owes to RT Ventures exceeds three hundred forty-five thousand dollars ($345,000), plus applicable taxes.

91.     Pursuant to the provisions of the Consulting Agreement, Prospect Canada is obligated to make future monthly payments of twenty-three thousand dollars ($23,000) per month, plus applicable taxes, for the duration of the Consulting Agreement.

92.     RT Ventures has complied and continues to comply with each of the obligations imposed on it under the Consulting Agreement.

WHEREFORE, Plaintiff RT Ventures respectfully requests that this Honorable Court enters judgment in its favor against Prospect Financial, Inc., awards RT Ventures its actual damages, which exceed seventy-five thousand dollars ($75,000), awards RT Ventures its attorney's fees, and awards RT Ventures its costs.

## COUNT II
### Turasky v. the Reykdals – Fraud in the Inducement
### (Consulting Agreement)

93.     Turasky re-alleges paragraphs one (1) through eighty-five (85) as paragraph ninety-three (93) of Count II.

94.     In the weeks leading up to April 15, 2016, the representations the Reykdals made to Turasky that Prospect Canada would pay Turasky a monthly consulting fee in the amount of twenty-three thousand dollars ($23,000) were inaccurate and false, Gordon knew those representations were inaccurate and false, and Gordon knew that Prospect Canada never intended to pay Turasky or any of Turasky's business entities twenty-three thousand dollars ($23,000) per month, plus applicable taxes, for a five (5) year period.

95.     In the weeks leading up to April 15, 2016, the Reykdals made the misrepresentations to Turasky about Prospect Canada paying Turasky the twenty-three thousand dollar ($23,000) monthly consulting fee to induce Turasky to move forward with the transactions in which Prospect USA became owner of the CR Fund I Properties, the Huntley Property, and the Elgin Property.

96.     Turasky justifiably relied on the Reykdals' misrepresentations that Prospect Canada would pay Turasky the twenty-three thousand dollar ($23,000) monthly consulting fee by moving forward with the transactions in which Prospect USA became owner of the CR Fund I Properties, the Huntley Property, and the Elgin Property.

97.     As a result of Turasky's reliance on the Reykdals' misrepresentations about the monthly consulting fee, Turasky moved forward with the transactions prosed in Prospect Canada's April 15, 2016 Board Resolution in which Turasky, or entities in which Turasky had an ownership interest, relinquished ownership and control of the CR Fund I Properties, the Huntley Property,

and the Elgin Property, and has not received any consulting fees from Prospect Canada since March 2017.

WHEREFORE, Plaintiff Turasky respectfully requests that this Honorable Court enters judgment in his favor against the Reykdals, awards Turasky his actual damages, which exceed seventy-five thousand dollars ($75,000), awards punitive damages and attorney's fees to Turasky, and awards Turasky his costs.

## COUNT III
### Turasky v. Carrie – Declaratory Judgment (Articles of Agreement for Deed)

98.    Turasky re-alleges paragraphs one (1) through eighty-five (85) as paragraph ninety-eight (98) of Count III.

99.    At all relevant times, Gordon was Carrie's authorized agent and alter ego with respect to the transaction between Carrie and Turasky concerning the Arizona Property.

100.    Beginning in late August or early September 2016, despite the fact that Carrie is the sole owner of record concerning the Arizona Property and Gordon had previously recorded a disclaimer of any right, title, interest, claim or lien of any kind or nature concerning the Arizona Property with the Maricopa County, Arizona Recorder, the Reykdals induced Turasky to purchase and occupy the Arizona Property. A chain of emails Gordon and Turasky exchanged between September 4, 2017 and September 7, 2016, concerning the Arizona Property (the September 2016 Emails") is attached hereto as Exhibit "D" and is hereby incorporated by reference.

101.    Based on representations Gordon made to Turasky that Turasky should expect to receive six hundred thousand dollars ($600,000) per year from Prospect Canada, Turasky reasonably believed that he could afford to purchase the Arizona Property.

102.     Based on Gordon's representations to Turasky about the amount of money Turasky should expect to receive from Prospect Canada on a yearly basis, Turasky agreed to purchase and take possession of the Arizona Property.

103.     On October 25, 2016, based on Gordon's representations to Turasky that Turasky should expect to receive six hundred thousand dollars ($600,000) per year from Prospect Canada, Turasky and Carrie executed the Articles of Agreement for Deed. *See generally* Exhibit C.

104.     On information and belief, Carrie never deposited a warranty deed or other documents contemplated in Paragraph 16 of the Contract for Deed in escrow with the title company in breach of her obligations to deposit such documents in escrow.

105.     When Turasky took possession of the Arizona Property, the most recent installment of real estate taxes had not been paid and the Reykdals were approximately six (6) months in arrears on payments to the homeowners' association.

106.     At all relevant times, payments Carrie has received related to the Arizona Property were required to be applied according to the provisions in Paragraph 2.F of said the Articles of Agreement for Deed. *See* Exhibit C, ¶ 2.F.

107.     On December 23, 2016, Prospect Canada did not pay the full amount of the consulting fee it was required to pay RT Ventures under the provisions of the Consulting Agreement.

108.     On or around December 23, 2016, Gordon notified Laura Rowell, a Prospect USA employee who worked out of Prospect USA's Elgin, Illinois, office, that eighteen thousand fifty-one and 90/100 dollars ($18,051.90) of the consulting fee Prospect Canada was obligated to pay RT Ventures pursuant to the Consulting Agreement would be applied toward Turasky's obligations under the Articles of Agreement for Deed.

109.    Neither Turasky, individually, nor RT Ventures has ever authorized Prospect Canada or Gordon to apply any amount of the monthly amount due under the Consulting Agreement toward the Articles of Agreement for Deed.

110.    Between December 2016 and March 2017, Prospect paid part of the monthly consulting fee it was obligated to pay RT Ventures pursuant to the Consulting Agreement, but has not paid any consulting fees to RT Ventures since March 2017.

111.    RT Ventures has made written demands for payment of the amounts due from Prospect Canada under the Consulting Agreement on multiple occasions.

112.    From December 1, 2016 through March 31, 2018, Turasky continued to make out-of-pocket monthly payments in the amount of eight thousand six hundred dollars ($8,600) and all other carrying costs associated with the Arizona Property in accordance with his obligations under the Contract for Deed except for the most recent installment of real estate taxes.

113.    Based on Gordon's representations that the consulting fee Prospect Canada has been obligated to pay to RT Ventures under the Consulting Agreement was being allocated toward Turasky's obligations under the Articles of Agreement for Deed, Turasky reasonably believed that Carrie was allocating the funds Prospect Canada was providing to her based on the requirements set forth in Paragraph 2.F of the Articles of Agreement for Deed.

114.    On April 1, 2018, Turasky did not pay the eight thousand six hundred dollar ($8,600) interest payment contemplated by Paragraph 2.C of the Articles of Agreement for Deed.

115.    On or around April 10, 2018, Carrie contacted Turasky's wife to notify Turasky that he was in default under the provisions of the Contract for Deed and that she planned to travel from Canada to Arizona to list the Arizona Property for sale.

116.    Based on Gordon's representations that the consulting fee Prospect Canada is obligated to pay RT Ventures under the Consulting Agreement was applied to Turasky's obligations under the Articles of Agreement for Deed, Turasky reasonably believes that he has at least two hundred fifteen thousand dollars ($215,0000) in equity with respect to the Arizona Property and has no obligation to make any interest payments or other costs contemplated under the Contract for Deed until November 1, 2018, which is the Articles of Agreement for Deed's Maturity Date.

WHEREFORE, Plaintiff Turasky respectfully requests that this Honorable Court determines the right and duties of the parties concerning the provisions of the Articles of Agreement for Deed; finds and declares that, based on Gordon's representations about the allocation of the consulting fee due to RT Ventures under the Consulting Agreement toward Turasky's obligations under the Articles of Agreement for Deed, that Turasky currently has an amount of equity in the Arizona Property to be determined by this Court; determines whether Turasky is obligated to make any payments under the Contract for Deed before the November 1, 2018 Maturity Date of the Contract for Deed based on Gordon's representations about allocating fees due under the Consulting Agreement toward Turasky's obligations under the Articles of Agreement for Deed; and awards Turasky his costs.

## COUNT IV
### Turasky v. the Reykdals – Fraud in the Inducement (Articles of Agreement for Deed)

117.    Turasky re-alleges paragraphs one (1) through eighty-five (85) and paragraphs ninety-nine (99) through one hundred and two (102) as paragraph one hundred and seventeen (117) of Count IV.

118.    Gordon knew that the representations he made to Turasky in the September 2016 Emails about Turasky expecting to receive at least six hundred thousand dollars ($600,000) per

year from Prospect Canada was false because he knew that Prospect Canada did not plan to pay RT Ventures the monthly consulting fee financial due under the Consulting Agreement.

119.    The misrepresentations Gordon made to Turasky in the September 2016 Emails about the money Turasky should expect to receive from Prospect Canada on an annual basis were made to induce Turasky to agree enter into the Contract for Deed concerning the Arizona Property.

120.    Turasky justifiably relied on Gordon's misrepresentations about the money Turasky should expect to receive from Prospect Canada on an annual basis by entering into the Articles of Agreement for Deed.

121.    Turasky has been injured as a result of his reliance on Gordon's misstatements because he entered into the Contract for Deed without receiving anywhere near the six hundred thousand dollars ($600,000) in annual income Gordon said Turasky should expect to receive from Prospect Canada, incurred expenses to move his family's personal property into the Arizona Property, has incurred property management fees associated with the Arizona Property, has paid to maintain the Arizona Property, and has paid to make improvements to the Arizona Property.

WHEREFORE, Plaintiff Turasky respectfully requests that this Honorable Court enters judgment in his favor against the Reykdals, awards Turasky his actual damages, which exceed seventy-five thousand dollars ($75,000), awards punitive damages and attorney's fees to Turasky, and awards Turasky his costs.

Respectfully submitted,

Richard P. Turasky, Individually,
Richard P. Turasky, Jr., as Trustee of the
Richard P. Turasky, Jr. Revocable Trust
dated April 17, 2009, and RT Ventures
Limited Partnership, a Delaware Limited
Partnership

By:      _____*/s/ Samuel J.H. Weyers*_____
              One of their Attorneys

Andrew J. Kelleher, Jr. (ARDC #6229557)
Samuel J.H. Weyers (ARDC #6307309)
Ronald B. Kowalczyk (ARDC #6274373)
KELLEHER & BUCKLEY, LLC
Attorneys for Plaintiffs
102 S. Wynstone Park Drive
North Barrington, IL 60010
(847) 382-9130
akelleher@kelleherbuckley.com
sweyers@kelleherbuckley.com
rkowalczyk@kelleherbuckley.com